**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| A.B., an individual, and J.F., an indivudal<br><br>Plaintiffs<br>v.<br><br>SALESFORCE.COM, INC. and<br>BACKPAGE.COM, LLC<br><br>Defendants. | CIVIL ACTION NO. 4:20-cv-01254 |

# PLAINTIFFS' FOURTH AMENDED COMPLAINT

## I. INTRODUCTION

1. True horror arises when the evil of the criminal mind meets the innovative brilliance of technology companies.

2. Fighting sex trafficking is hard enough for law enforcement without America's best and brightest tech talent supporting criminals.

3. The criminal justice system has been bearing the cross in the fight against sex trafficking for far too long by prosecuting the traffickers and sex buyers. It is now time for the civil justice system to hold the other beneficiaries of sex trafficking to answer for their wrongs.

4. Our society can no longer turn a blind eye to the negative side of what happens on-line and the role technology companies often knowingly play in unlawful activity. The price in doing so is too great. It is time to address the fact the law has not kept up with technology and adjust accordingly.

5. The unfettered and unchecked growth of the internet and technology companies have led to online illicit drug sales, black market gun sales, unregulated sale of human body parts, the sale of children for sex and the sale of human beings for forced sex and labor.

6. Technology companies cannot divorce themselves from the technologies they create and unlawful, harmful and costly atrocities they knowingly benefit from facilitating.

7. This case is about the sale of A.B. who was sold for sex through force, fraud, and coercion, and J.F. who was sold for sexual activity by any means, and the role Salesforce.com, Inc. and Backpage.com ("Salesforce" and "Backpage" herein) played in the online facilitation of sex trafficking.

8. Salesforce is undisputedly one of the world's greatest technology innovators, creating powerful and effective tools that have revolutionized business function and growth.

9. In public, including social media, Salesforce has boasted about fighting human trafficking.

10. But in reality Salesforce provided Backpage with the tools, support and resources Backpage needed to operate and grow. Specifically, including, but not limited to: a world renowned Customer Relationship Management (CRM) system, the CRM interface allowing Backpage to integrate with the credit card processors, the tools to text potential and past clients, marketing tools and automation power that enabled Backpage to reach more and more traffickers and sex trafficking victims.

11. By supplying its tools, support and resources to Backpage, Salesforce knowingly facilitated sex trafficking and directly enabled Backpage to function.

12. The design, implementation and support of Salesforce's product is a complex endeavor, personalized to every business.

13. Salesforce will claim that no matter what role they played in the development, operation and amplification of Backpage's business model, they should be completely shielded

and will go to extraordinary lengths to have this case dismissed without any opportunity for A.B. and J.F. to proceed with their cases.

14. Salesforce, as with its' big tech brethren, continue to attempt to operate above the law and answer to no one. This is even true while our Country is dealing with a public health crisis as a result of online sex trafficking.

15. The Communications Decency Act ("CDA") was never intended to protect technology companies from being held accountable for sex trafficking.

16. Relatedly, the Trafficking Victims Protection Act (TVPA) was enacted to extend liability for sex trafficking beyond the primary actors to others who knowingly benefited by facilitating sex trafficking.

17. Likewise, Texas, took the lead among other states by enacting a provision similar to the TVPA, and Plaintiffs A.B. and J.F. bring claims under the statute codified in Chapter 98 of the Texas Civil Practice and Remedies Code.

18. For these reasons, and with great strength and courage, A.B. and J.F. bring suit under the TVPA, Chapter 98, civil conspiracy and related causes of action.

## II. JURISDICTION & VENUE

19. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TRVPA"), 18 U.S.C. § 1581, *et seq.*

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

21. A.B. and J.F. were trafficked in this District and Division.

## III. THE PARTIES

22. A.B. is a natural person who is a resident and citizen of Texas.

23. J.F. is a natural person who is a resident and citizen of Texas.

24. Salesforce has been served and appeared herein.

25. Salesforce does business in a systematic and continuous manner throughout this District and Division.

26. All references to Salesforce includes any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein.

27. Defendant Backpage.com, LLC ("Backpage") has been served.

28. All references to Backpage includes any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein.

## IV. JURISDICTIONAL FACTS

29. Salesforce is registered to do business in Texas and has been since at least 2005.

30. Salesforce has purposefully availed itself of the laws, benefits, and privileges of doing business in Texas since 2005.

31. Salesforce's operates and conducts business in Texas, which includes providing services to companies such as Backpage.

32. Salesforce caused injury to both A.B. and J.F. in Texas.

33. Salesforce was a producing and proximate cause of the individual injuries to A.B. and J.F.

34. Salesforce has minimum contacts with Texas.

35. Salesforce targets Texas as a marketplace for its products and services.

36. Salesforce directs marketing and advertising to Texas.

37. Salesforce advertised its business in Texas as a "game-changing" service for every industry under the sun to provide operational support to businesses.

38. The effect of Salesforce's facilitation of Backpage's operations resulted in the posting of advertisements for sex trafficking in Texas on Backpage.

39. A.B. and J.F. were trafficked in Texas as a result of a Backpage ad posted in Texas.

40. Salesforce's victims, including A.B. and J.F., were harmed in Texas.

41. A.B. and J.F.'s injuries suffered in Texas are related to Salesforce's business in and contacts with Texas.

42. Salesforce could reasonably have anticipated being sued in Texas for claims related to its business and contacts with Texas.

43. The exercise of specific personal jurisdiction over Salesforce in Texas comports with the notions of fair play and substantial justice.

44. The exercise of specific personal jurisdiction over Salesforce in Texas is consistent with the due process requirements of the Constitutions of both the United States and Texas.

45. Salesforce has been named as a Defendant in Texas in multiple human trafficking lawsuits resulting from its facilitation of human trafficking through its venture with Backpage.

46. Salesforce did not contest personal jurisdiction in any of the previous human trafficking lawsuits filed against Salesforce in Texas.

47. Salesforce attempted, unsuccessfully, to remove two of the previous filed lawsuits to Federal Court, which were ultimately remanded back to Texas state court.

48. Once the cases were remanded back to Texas state court, Salesforce sought affirmative relief from Texas courts related to claims similar to those brought herein. By seeking affirmative relief related to the similar claims, Salesforce has availed itself of the privileges and benefits of Texas law, specifically as it related to claims for human trafficking in Texas, such as the claims brought by A.B. and J.F.

49. For these reasons, specific personal jurisdiction over Salesforce is proper.

50. General jurisdiction is proper over Backpage because its principal place of business is in Texas.

## V. BACKGROUND FACTS

### A. Sex trafficking hits epidemic proportions in the United States as a direct result of the internet.

51. The internet has transformed the commercial sex trade, and in the process, the evil of sex trafficking has hit epidemic proportions.

52. Estimates are that in 2016 there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide, including 4.8 million people trapped in sexual exploitation.[1]

[1] INT'L LABOUR OFFICE, *Global estimates of modern slavery: Forced labour and forced marriage*, at 9, 38 (available at https://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/publication/wcms_575479.pdf).)

53. With the help of online advertising, pimps and traffickers can reach entirely new audiences, evade law enforcement detection and maintain control of victims by transporting them quickly between locations thus maximizing profits far beyond traditional trafficking methods.

54. Sex trafficking previously took place on the streets, casinos, truck stops and in other physical locations. Now, most sex trafficking, including the trafficking of A.B. and J.F., is facilitated online.

55. Backpage, as early as 2008, had been publicly identified by law enforcement, United States Attorneys General and every United States Governor as the biggest and most notorious sex trafficking and pimping website in the United States.

56. The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors."[2]

57. During 2013-2015, Backpage earned over 99% of its revenue from online sex trafficking.[3]

**B. Salesforce acknowledges the responsibility, importance and the power technology companies have in our communities.**

58. Salesforce's President of Legal and General Counsel, Amy Weaver, stated: "Businesses are becoming very powerful platforms for change. When you have power, it is imperative to use it in a positive way.[4]"

59. Salesforce does not deny that it has an ethical duty and obligation to prevent atrocities such as sex trafficking from being proliferated by its technology.

60. Salesforce CEO and founder Marc Benioff stated[5]:

---

[2] https://www.hsdl.org/?view&did=797979 (last accessed May 14, 2020).
[3]https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Redacted.pdf (at *11).
[4] https://www.legal500.com/gc-magazine/interview/amy-weaver-general-counsel-salesforce/ (last accessed May 14, 2020).
[5] https://www.salesforce.com/company/ethical-and-humane-use/ (last accessed May 14, 2020).

> "Here at Salesforce, we have determined that this ethic(al) and humane use of technology, especially within the context of the Fourth Industrial Revolution, must be clearly addressed, not only by us, but by our entire industry. Our industry has reached an inflection point that must be supported by a strong set of guiding values.
>
> We have to make sure that technology strengthens our societies, instead of weakening them. Technology needs to improve the human tradition, not undermine it."

61. On October 16, 2019, Marc Benioff was vocal about the need to increase the regulation of tech by calling for complete reformation of the Communications Decency Act to hold technology companies accountable for when they fail our communities:[6]




62. Publicly, Salesforce took credit for using its talent and expertise to help fight human trafficking:




[6] https://twitter.com/benioff/status/1184560764692107270?lang=en (last accessed May 14, 2020).




63. Behind the scenes, however, Salesforce conducted business with one of the most prolific online sex trafficking sites ever known.

**C. Salesforce chose to do business with Backpage.**

64. In 2013, Backpage did not have the ability to scale its online marketing and advertising platform into an international sex-trafficking hub without operational support, marketing innovation and guidance.

65. In 2013, Backpage sought a partnership that would assist in growth objectives as well as concealing their activity and moving operations offshore to evade law enforcement.

66. Salesforce advertises itself as a company that can drive business growth through the use of customer relationship management, marketing consultation and implementation, financial processing implementation and support, bespoke analytics and other applications and technology.

67. Any reasonably prudent examination of Backpage's business operations or a simple google search would have indicated Backpage was not a general online marketplace but was actually the predominant force in online sex trafficking.

68. At the time of Salesforce's involvement in 2013, Backpage's illegal activity was widely known and reported news.[7]

69. In 2013, Backpage signed the first of many contracts with Salesforce and paid Salesforce for its technology and support.

70. Even if Backpage's illegal business practices were not previously known to Salesforce, Salesforce was in a position where it would learn, and in fact did learn, about the illegal business practices of Backpage once the venture was formed. [8]

71. Armed with this knowledge, Salesforce chose to financially benefit by doing business with Backpage, the largest sex trafficker in modern history.

**D. Salesforce provided tools and expertise necessary for Backpage's exponential growth.**

72. Salesforce sold and supported targeted solutions essential for Backpage's operational needs.

73. Salesforce was the driving force that enabled Backpage to scale its operations. Salesforce provided the infrastructure for Backpage to move and operate its business overseas.

74. When Backpage was under intense law enforcement scrutiny in 2015, Salesforce sold a duplicate copy of Backpage's system to a Backpage related entity in Amsterdam.

75. Backpage relied on Salesforce's expertise to implement and execute the use of Salesforce's complicated technology. Salesforce's technology was used by Backpage to actively

---

[7] *See, e.g.*, *See*, *e.g.*, Nicholas Kristof, N.Y. TIMES, Jan. 25, 2012, *Opinion | How Pimps Use the Web to Sell Girls*, available at https://www.nytimes.com/2012/01/26/opinion/how-pimps-use-the-web-to-sell-girls.html; Daniel Fisher, FORBES, Jan. 26, 2012, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, available at https://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution-ads-that-are-everywhere); https://www.justice.gov/opa/press-release/file/1052531/download (acknowledging that vast majority of activity was illegal).

[8] *See, e.g.,* https://www.bloomberg.com/news/videos/2019-03-27/salesforce-accused-of-aiding-sex-traffickers-video (noting that Backpage's illegal activities were well known as far back as 2008).

obtain and monitor data and additional information related to pimps and sex traffickers that were using Backpage. The use of this technology for these efforts was not a secret.

76. Backpage was successful in getting additional services, ongoing support, and addressing evolving financial concerns through its ongoing communications and relationship with Salesforce.

77. Salesforce provided SMS texting capabilities and support to Backpage, which was a technology not previously available to Backpage.

78. Salesforce also provided Backpage with capabilities and support for direct marketing campaigns, coupled with information gathering such as ad clicks and tracking internet activity of the sex traffickers to "help [Backpage] manage and track the effectiveness of [Backpage's] marketing efforts."

79. Salesforce's technology then was a primary monitoring mechanism of the progress of Backpage's efforts in order to track its success, gain other information from the recipients and further automate and develop Backpage's operations.

80. Every interaction that Salesforce's technology tracked through the CRM tools was an integral part of the strategy and technology used by Backpage to solicit sex traffickers and their victims.

81. Salesforce designed and facilitated Backpage's CRM interface that allowed Backpage to integrate with credit card processors.

82. Backpage used the CRM tools provided by Salesforce to interface with credit card processors giving Backpage the ability to accept payments from pimps and traffickers.

83. Salesforce's relationship with Backpage endured several nationwide law enforcement efforts, multiple civil lawsuits against Backpage, the U.S. Senate hearing and most

troubling, the arrest of Backpage's CEO for conspiracy to commit pimping by Attorney General Kamala Harris.

84. From the time of its inception and until its conclusion (Salesforce's relationship with Backpage ended upon the seizure of Backpage by the Department of Justice), Salesforce succeeded in growing Backpage from a small Dallas based company with a handful of employees to an international powerhouse with over 250 employees spanning three continents.

85. Based on publicly available documents, Backpage earned appropriately $71 million in revenue in 2012. In the next 29 months, from January 2013 through May 2015, Backpage earned approximately $346 million in revenue, with nearly $340 million being from online sex trafficking.

**E. A.B. and J.F. are trafficked on Backpage during its relationship with Salesforce.**

86. Tragically, before Backpage was seized by the Department of Justice, A.B. and J.F. were trafficked by advertisements on Backpage.

87. In or around 2014, A.B. was sold for unlawful sex acts through force, fraud and coercion.

88. In or around 2018, J.F. was sold for unlawful sex acts by any means.

89. A.B. and J.F. were trafficked through Backpage advertisements placed on Backpage's website under the "Houston" geographic area.

90. A.B.'s trafficking in Houston as a result of Backpage advertisements occurred in 2014.

91. The Southern District of Texas, Houston Division has already begun the process of securing justice for Plaintiff J.F. by sentencing one of her traffickers to 480 months of imprisonment followed by lifetime supervised release; and sentencing her other trafficker to 220

months imprisonment followed by 15 years of supervised release (subject to a plea agreement). It is only fitting that this court be the venue where Plaintiff J.F. derives the remaining justice that she is due, by holding accountable the companies that jointly ventured in her trafficking.

92. The trafficking of A.B. and J.F. was made possible by Backpage, facilitated by the tools and operational support provided by Salesforce.

93. A.B. and J.F. suffered significant physical and emotional injuries as a result of the trafficking.

## VI. CAUSES OF ACTION

## A. CAUSES OF ACTION AGAINST SALESFORCE

### 1. FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPA

94. A.B. and J.F. incorporate all other allegations as if set forth in full herein.

95. At all relevant times, A.B. and J.F. were and are victims within the meaning of 18 U.S.C. § 1595(a).

96. Salesforce benefitted from the products and assistance it provided to Backpage, which Salesforce knew or should have known was facilitating sex trafficking.

97. More specifically, Salesforce knowingly assisted, supported and facilitated sex trafficking by, at a minimum, enabling Backpage to conduct the following:

a. Gathering and managing information from traffickers' and pimps' public social media activity, including but not limited to their likes and dislikes and what they are saying and sharing about Backpage and its competitors;

b. Developing an infrastructure for a trafficker and pimp database, as well as tracking and collecting trafficker and john data across multiple platforms including phone, email, websites and social media;

c. Collecting traffickers' and pimps' data across multiple sources and channels and using this information to promote Backpage and the use of its services;

d. Automatically generating insights into traffickers' and pimps' purchasing habits to help Backpage understand the traffickers better and predicting how they will feel and act so Backpage could prepare the most effective outreach;

e. Collecting information of sex traffickers and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

f. Analyzing information and behavior of pimps and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

g. Utilization of cloud storage to store (and secure) operational database and information;

h. Implementing a significant payment processing interface capability allowing Backpage to connect with credit card companies and integrating payment information with information about pimps and traffickers;

i. Improving the solicitation of sales opportunities to traffickers and pimps for Backpage;

j. Improving and implementing the solicitation of referrals from existing traffickers and pimps using Backpage by creating cross-selling and upselling opportunities;

k. Duplication of operating system to evade law enforcement in or around 2015; and

l. System modification to enable operation from three continents.

### 2. SECOND CAUSE OF ACTION—TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98

98. A.B. and J.F. incorporate all other allegations as if set forth in full herein.

99. Salesforce's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

100. Salesforce knowingly assisted, supported, and facilitated sex trafficking by, at a minimum, engaging in the acts described above in paragraph 94, which are incorporated by reference.

101. Therefore, Salesforce is in violation of Texas Civil Practice and Remedies Code § 98.002.

### 3. THIRD CAUSE OF ACTION—NEGLIGENCE

102. A.B. and J.F. incorporate all other allegations as if set forth in full herein.

103. Salesforce had a duty to the general public and to persons affected by its products, including A.B. and J.F., to take reasonable steps to protect them from the foreseeable dangers of its products as related to human trafficking.

104. Salesforce failed to exercise ordinary care as would a reasonably prudent person under the same circumstances.

105. Salesforce was negligent by, at a minimum, providing the tools, expertise, and support to Backpage to facilitate and profit from the posting of sex trafficking victim, as more fully described in paragraph 94, which is incorporated by reference.

106. Furthermore, once Salesforce undertook a duty to provide its tools, expertise, and support to Backpage, it had an ongoing duty to ensure that those tools were being used for good, especially as Backpage's notoriety grew. Salesforce's negligence continued throughout its relationship with Backpage, as Salesforce continued to provide support for Backpage's sex trafficking operations.

107. Salesforce's negligent actions proximately caused individual legal injuries to A.B. and J.F.

108. Each of Salesforce's negligent acts and omissions, singularly or collectively, constituted negligence and proximately caused individual legal injuries to A.B. and J.F.

### 4. FOURTH CAUSE OF ACTION—GROSS NEGLIGENCE, RECKLESSNESS, WILLFUL AND WANTON CONDUCT

109. A.B. and J.F. incorporate all other allegations as if set forth in full herein.

110. Salesforce's acts and omissions constitute gross neglect, recklessness and willful and wanton conduct.

111. Viewed objectively from the standpoint of Salesforce at the time of the incidents, Salesforce's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to A.B., J.F., and other victims.

112. Salesforce nevertheless demonstrated an utter indifference to or conscious disregard for a person's safety or the safety of others, including A.B. and J.F.

113. Exemplary damages are warranted for Salesforce's gross negligence, recklessness and willful and wanton conduct.

## B. CAUSES OF ACTION AGAINST BACKPAGE

### 1. FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPA

114. A.B. and J.F. incorporate all other allegations as if set forth in full herein.

115. At all relevant times, A.B. and J.F. were and victims within the meaning of 18 U.S.C. U.S.C. § 1595(a).

116. Backpage directly facilitated sex trafficking through the posting of advertisements for sex trafficking, in addition the following non-exclusive acts:

a. Providing a forum for Plaintiffs' traffickers to post them for trafficking;

b. Failing to stop online posting of A.B., J.F., and other human or sex trafficking victims;

c. Accepting advertising fees from www.backpage.com from human traffickers, including Plaintiffs' traffickers, despite actual and/or constructive knowledge that those advertisements were for illegal activities, such as, but not limited to human trafficking, prostitution, and/or sexual exploitation of victims;

d. Designing and implementing The Strip Term from Ad Filter to automatically sanitize advertisements intended to promote human trafficking, prostitution, and/or the sexual exploitation of victims in an effort to maximize advertising revenue, customer satisfaction and avoid law enforcement detection of illegal acts;

e. Designing and implementing, in order to maximize revenue, a manual moderation system intended to sanitize posted content advertising human trafficking, prostitution, and/or the sexual exploitation of victims to give those ads the appearance of promoting legal escort services as opposed to illegal services;

f. Implementing a corporate policy to maximize revenue of sanitizing advertisements promoting human trafficking, prostitution, and/or sexual exploitation of victims instead of removing those advertisements from Backpage or reporting those advertisements to the proper law enforcement officers;

g. Knowingly implementing a corporate policy in order to maximize profit from the adult section of Backpage.com that discouraged moderators and employees of Backpage from contacting the authorities and/or advocacy groups when advertisements on Backpage.com clearly promoted human trafficking, prostitution, and/or sexual exploitation of victims;

h. Knowingly refusing to pull down advertisements (after Backpage had internally sanitized the ad either manually or with the use of the Strip Term from Ad Filter) that clearly demonstrated victims were being exploited and trafficked for sex; and

i. Knowingly refusing to pull down advertisements after reports and/or complaints that the advertisement was being used to exploit a victim.

117. Backpage directly benefited from the posting of advertisements for sex trafficking.

118. Backpage's TVPRA violations were a direct, producing and proximate cause of the injuries and damages to A.B.

### 2. Second Cause of Action— Texas Civil Practices and Remedies Code Chapter 98

119. A.B. and J.F. incorporate all other allegations as if set forth in full herein.

120. Backpage's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

121. Backpage had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as A.B. and J.F.

122. At all relevant times, Backpage breached this duty by knowingly participating in the facilitation of trafficking victims, including A.B. and J.F., by acts and omissions including, but not limited to the acts described above in paragraph 113, which is incorporated by reference.

123. As described throughout this petition and above, Backpage received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or

commissions were the producing, but for, and proximate cause of Plaintiffs' injuries and damages. Therefore, Backpage is in violation of Texas Civil Practice and Remedies Code § 98.002.

### 3. THIRD CAUSE OF ACTION—NEGLIGENCE

124. A.B. and J.F. incorporate all other allegations as if set forth in full herein.

125. Backpage had a duty to the general public and to persons affected by its online sex trafficking business, including A.B. and J.F., to take reasonable steps to protect them from the foreseeable dangers of sex trafficking.

126. Furthermore, Backpage undertook additional duties by deciding to monitor, edit, strip and otherwise moderate content. Once it undertook to perform these duties, it had an ongoing obligation to not breach such duties.

127. Backpage failed to exercise ordinary care as would a reasonably prudent person under the same circumstances.

128. Backpage was negligent, at a minimum, through the acts described above in paragraph 113, which are incorporated by reference.

129. Backpage's negligent actions were a proximate cause if Plaintiffs' injuries.

### 4. FOURTH CAUSE OF ACTION—GROSS NEGLIGENCE, RECKLESSNESS, WILLFUL AND WANTON CONDUCT

130. A.B. and J.F. incorporate all other allegations as if set forth in full herein.

131. Backpage's acts and omissions constitute gross neglect, recklessness and willful and wanton conduct.

132. Viewed objectively from the standpoint of Backpage at the time of the incidents, Backpage's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to A.B. and J.F.

133. Backpage nevertheless demonstrated an utter indifference to or conscious disregard for a person's safety or the safety of others, including A.B. and J.F.

134. Exemplary damages are warranted for Backpage's gross negligence, recklessness and willful and wanton conduct.

## C. CAUSES OF ACTION AGAINST BOTH BACKPAGE AND SALESFORCE

### CIVIL CONSPIRACY

135. A.B. and J.F. incorporate all other allegations.

136. Salesforce entered into a civil conspiracy with Backpage. More specifically, Salesforce and Backpage are: 1) a combination of two or more persons; (2) Salesforce and Backpage sought to expand Backpage's operations; (3) Salesforce and Backpage reached a meeting of the minds on the course of action by entering into a contractual relationship; (4) at a minimum, using the tools, expertise and support of Salesforce, Backpage committed one or more unlawful, overt acts (i.e. the posting of illegal ads for sex trafficking); and (5) damages occurred as a proximate result of this conspiracy.

137. Therefore, through the civil conspiracy between Backpage and Salesforce, each defendant is liable for the conduct of their co-conspirators.

## VII. DAMAGES

138. Salesforce and Backpage's acts and omissions, individually and collectively, caused A.B. and J.F. to sustain legal damages.

139. A.B. and J,F. are entitled to be compensated for personal injuries and economic damages, including:

a. Actual damages;

b. Direct damages;

c. Incidental and consequential damages;

d. Mental anguish and emotional distress damages (until trial and in the future);

e. Restitution;

f. Unjust enrichment; and

g. Penalties.

140. A.B. and J,F. are entitled to exemplary damages by statute.

141. A.B. and J,F. are entitled to treble damages.

142. A.B. and J,F. are entitled to recover attorneys' fees and costs of court.

143. A.B. and J,F. are entitled to pre- and post-judgment interest at the maximum legal rates.

144. A constructive trust should be imposed on Backpage and Salesforce and the Court should sequester any benefits or money wrongfully received by Backpage and Salesforce for the benefit of A.B. and J.F.

## VIII. JURY TRIAL

145. Plaintiffs demand a jury trial on all issues.

## IX. RELIEF SOUGHT

146. Wherefore, A.B. and J.F. respectfully requests judgment against the Defendants for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees and all other relief, at law or in equity, to which she may be justly entitled.

Respectfully submitted,

ANNIE MCADAMS PC

By: /s/ Annie McAdams

ANNIE MCADAMS, PC
Annie McAdams
State Bar No. 24051014
S.D. Tex. No. 1514589
1150 Bissonnet
Houston, Texas 77005
Telephone: (713) 785-6262
Facsimile: (866) 713-6141
annie@mcadamspc.com

and

By: /s/ David E. Harris

SICO HOELSCHER HARRIS LLP
David E. Harris
State Bar No. 24049273
S.D. Tex. No. 712461
Craig M. Sico
Texas Bar No. 18339850
Federal I.D. No. 13540
Jeffrey H. Richter
Texas Bar No. 24061614
Federal I.D. No. 1794395
Brad Gilde
Texas Bar No. 24045941
Federal I.D. No. 954906
802 N. Carancahua, Ste. 900
Corpus Christi, Texas 78401
Telephone: (361) 653-3300
Facsimile: (361) 653-3333
dharris@shhlaw.com
csico@shhlaw.com
jrichter@shlaw.com
bgilde@shhlaw.com

and

THE GALLAGHER LAW FIRM
Michael T. Gallagher
State Bar No. 07586000
S.D. Tex. No. 5395
Pamela McLemore
State Bar No. 24099711
2905 Sackett Street
Houston, Texas 77098
Telephone: (713) 222-8080
Facsimile: (713) 222-0066
mike@gld-law.com
pamm@gld-law.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 5th day of October 2021, a true and correct copy of the above and foregoing document was served upon all counsel of record via the Court's electronic filing system in accordance with the Federal Rules of Civil Procedure.

/s/ Annie McAdams
Annie McAdams