**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| A.B., an individual, et. al, | |
| Plaintiffs | |
| v. | CIVIL ACTION NO. 4:20-cv-01254 |
| SALESFORCE.COM, INC. and BACKPAGE.COM, LLC | |
| Defendants. | |

## PLAINTIFFS' OPPOSED MOTION TO MODIFY PROTECTIVE ORDER[1]

### SUMMARY

There are numerous cases across the country pending against Salesforce for its role in human trafficking, including the cases pending in front of this Court.  Salesforce has sought to avoid liability and discovery by asserting immunity under 47 USC 230, the Communications Decency Act (CDA) at the outset, typically through the filing of a motion to dismiss. While this Court wisely allowed limited discovery before definitely ruling on the applicability of the CDA to Plaintiffs' claims, other courts have not done so.  As a result, there have been rulings made in favor of Salesforce that are effectively no-evidence motions for summary judgment without the benefit of discovery.  Salesforce is now trying to use those rulings to avoid liability and discovery in other jurisdictions. Plaintiffs are rightfully concerned with the effect of inconsistent rulings, especially inconsistent rulings arising out of a disparity in the evidence the court has been allowed to review. Salesforce itself has cautioned against inconsistent rulings.[2]

---

[1] Plaintiffs respectfully request that the Court set this Motion for an in-person hearing.  This hearing is likely to involve explanations of and references to documents that were produced under the Stipulated Protective Order in this case.
[2] This Court also recognized this issue in its Order for Consolidation (Dkt. 20).

For example, in moving to form a Multi-District Litigation in Texas state court, Salesforce stated that "[h]aving multiple judges address these issues would waste judicial resources and risk conflicting rulings, as well as overlapping and duplicative discovery burdens on parties and witnesses."[3] Similarly, Salesforce moved to transfer a related case into this consolidated proceeding, arguing that a "transfer is necessary to facilitate the resolution of common issues and avoid the type of inconsistent rulings against which the Fifth Circuit and this District have cautioned."[4] However, while expressing concern about consistency of rulings, Salesforce has done everything it can to assure inconsistency in the facts being considered by other courts. Plaintiffs agree that inconsistent rulings are problematic, but Plaintiffs also believe that any determinations on the applicability of the CDA to human trafficking claims against Salesforce should be based on the actual facts – not argument and innuendo offered by counsel for Salesforce. Unfortunately, such a result recently occurred.

On May 16, 2022, Judge Wood of the United States District Court for the Northern District of Illinois, Eastern Division, issued an opinion in which in granted a motion to dismiss that made similar arguments to what Salesforce argued in this case. However, unfortunately for the plaintiffs in Chicago (who is represented by counsel for one of the plaintiffs in this case), the court did not allow discovery. Instead, Judge Wood relied on Salesforce's representations and indulged several inferences in favor of Salesforce, specifically noting that the plaintiff there had failed to present specific examples of certain allegations, which would of course be impossible without discovery. Thus, the Court effectively granted a no-evidence summary judgment with no discovery, dismissing plaintiff's claims.

---

[3] Ex. "A", Salesforce Motion for Transfer and Request for Stay, 11/1/19.
[4] Dkt. 10-1, at pg. 7.

Salesforce is now submitting Judge Wood's opinion as authority in other cases involving Salesforce, including a fully briefed case pending in the Northern District in Texas,[5] as well as the fully briefed D.R. case pending in this Court.[6] However, many of the factual inaccuracies or inferences contained in Judge Wood's opinion are contradicted by even the limited evidence developed in this case to date. Therefore, for the reasons set out below, Plaintiffs respectfully request that the Court modify the Stipulated Protective Order (Dkt. 80) in this matter to allow sharing so that justice may be done. More specifically, Plaintiffs request that the current Protective Order be modified to allow sharing with "litigants or attorneys for a litigant involving similar allegations of the facilitation of human trafficking against Salesforce." Alternatively, Plaintiffs respectfully request that the Court, at an absolute minimum, revise the current Protective Order to allow counsel for litigants in this case to share with themselves in other cases involving allegations of the facilitation of human trafficking against Salesforce.

## ARGUMENT[7]

### 1. Salesforce is concealing the truth.

At the outset, Plaintiffs believe it is necessary to bring attention to Salesforce's original Motion to Dismiss filed in this matter (Dkt. 23), as it is very similar to other motions that Salesforce has filed across the country. Salesforce has aggressively used the threat of sanctions to intimidate plaintiffs into amending their allegations, which it did in this case. Although Plaintiffs stand by

---

[5] *See A.M. v Salesforce, et. al*, Case 3:21-CV-01668, in the United States District Court, Northern District of Texas, Dallas Division, Dkt. 26.

[6] Dkt. 143 and 144.

[7] Before discussing why Plaintiffs should be able to share discovery in this matter, they believe it is important to advise the Court of outstanding discovery in this matter. A more detailed update on the status of discovery is contained later in this Motion, but to summarize, after this Court ordered limited CDA discovery on July 7, 2021, Plaintiffs requested depositions on July 8, 2021, and served written discovery on July 12, 2021. After numerous letters, Motions, hearings, rulings, and various Orders from this Court, as of June 1, 2022, it is Plaintiffs understanding that they have received the materials that Salesforce believes are responsive to what has been ordered by this Court. The deposition of Michael McLaughlin has been scheduled for July 15, 2022.

their original allegations (and have made that clear to Salesforce), Plaintiffs' counsel took Salesforce's threats seriously and, in reliance upon representations by Salesforce's counsel, did make several amendments to their original complaint for the express purpose of avoiding delay and moving the litigation forward.  Despite Plaintiffs making it clear that such amendments were form over substance and done only to avoid further delay, Salesforce went out of its way to highlight the fact of the  amendments in its Motion to Dismiss to besmirch Plaintiffs' counsel:[8]

> The operative complaints, all filed by the same counsel, reflect significant changes from the original versions. The original complaints included a host of false allegations suggesting that Salesforce worked directly with Backpage in various ways to help design, build, and operate a sex-trafficking business. For instance, the complaints alleged that, "behind closed doors, Salesforce was knowingly and directly soliciting and facilitating sex trafficking" for Backpage.  They asserted that Salesforce "did not simply provide Backpage with an off-the-shelf version of its software" (id. ¶ 13), but instead "customize[d] the services provided to Backpage to facilitate sex trafficking" (id. ¶ 81). And they alleged that Salesforce "actively obtained and monitored data … related to pimps and sex traffickers that were using Backpage" (id. ¶ 84) and "used [that data] for direct outreach campaigns, including but not limited to direct advertisements and targeted, personalized e-mails" (id. ¶ 87).

> All these allegations are now gone. After Salesforce sent two Rule 11 letters to Plaintiffs' counsel demanding removal of these and other false allegations, Plaintiffs' counsel removed all allegations suggesting that Salesforce was directly involved in either Backpage's business operations and/or marketing campaigns or in knowingly assisting the facilitation of trafficking.

In hindsight, with the benefit of discovery, Plaintiffs would not have made such amendments, as the representations by Salesforce have been repeatedly contradicted by the evidence uncovered through discovery.  Unfortunately, other courts are not allowing discovery and are issuing opinions that are based on the very representations of Salesforce that are contradicted by the evidence uncovered through just the limited discovery allowed in this case. And just as it did in this case, Salesforce is using the threat of sanctions and good-faith amendments

---

[8] Salesforce supported its Motion to Dismiss with the Declaration of Kristin Linsley, which also discussed the Rule 11 sanctions threats made by Salesforce.  Dkt. 24.

to advance its CDA defense.[9]  Salesforce's conduct must be stopped so that courts and litigants can determine threshold legal issues on the facts.

## 2. Even the simplest and most basic facts have been concealed, and sharing is the only way to bring the truth to light.

It is undisputed that Backpage contracted with Salesforce to provide certain products and services to Backpage.[10]  It was Plaintiffs' understanding that this relationship began in 2013, as Plaintiffs used that date in their Complaints, and Salesforce did not contend otherwise and certainly did not reveal any prior contacts with Backpage.  This Court ordered Salesforce to produce certain communications with law enforcement (Dkt. 142). ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Interestingly, Salesforce used the █████████████████████████████████████

███████████████████████████  This is notable because Website Technologies did not exist as

---

[9] Ex. "B", *G.G. v. Salesforce, et al.*, in the United States District Court, Northern District of Illinois, Eastern Division, Motion of Defendant Salesforce to Dismiss TAC (Dkt. 63), at pgs. 2-4.
[10] While the ultimate legal entity to consummate the transaction was Website Technologies, a Backpage affiliate, Salesforce prepared initial presentations and legal documents for Backpage, which shows they knew they were dealing with Backpage at all material times.
[11] Ex. "C", ██████████████████████

a legal entity until January of 2013.[12] Thus, although Salesforce has known for years ███████

███████████████████████████ Plaintiffs only recently learned that fact upon receipt

of production ordered by this Court. And this cannot be a simple oversight, as Salesforce produced



Plaintiffs did not learn that Salesforce ██████████████████████████

███████████████████████████████████████████████ While the total impact

of these factual issues has yet to be determined, it is a very clear example of how Salesforce intends

to litigate the cases pending against it – through suppression and obfuscation of the truth.

---

[12] Ex. "D", Website Technologies Secretary of State Registration.
[13] Ex. "E", █████████████████████████████; Ex. "F", ███████████████████

Indeed, this is not the first time that discovery in this matter has contradicted representations by Salesforce.  For example, it its Motion to Dismiss (Dkt. 23), Salesforce claims that "Plaintiffs allege that Salesforce sold its CRM software to a Backpage affiliate," and it support of that claim, cites to paragraphs 10, 74, 77-78, and 94 of Plaintiffs Third Amended Complaint (Dkt. 21).  A review of the paragraphs of Plaintiffs' TAC cited by Salesforce shows that Plaintiffs never once use the term "Backpage affiliate."  This distinction is important because Salesforce has continuously argued that it provided services and products to a Backpage affiliate, Website Technologies, suggesting it was a simple arms-length transaction for a standard product.[14]  However, documents produced by Salesforce show that,



---

[14] *See* Dkt. 60, at ¶ 70 ("Salesforce admits that it sold generally available, off the shelf customer relationship management tools to Website Technologies LLC, an affiliate of Backpage.com, LLC.").
[15] Ex. "G",
[16] Ex. "H",

Salesforce has also represented to this Court and others that it sold Backpage an "out-of-the-box" product and that there was "no implementation:"[19]

| 23 | document that.  There was no implementation.  Salesforce sold |
| 24 | them an out-of-the-box software that you could dump your |
| 25 | computer data into, that it's an interactive program that can |



Salesforce further represented that Salesforce had no visibility into Backpage's data:[22]

| 2 | Salesforce has no visibility, none, into that data in terms of |
| 3 | having access to whatever data is in the customer's account. |
| 4 | By contract they do not do that except under very narrow |
| 5 | circumstances that don't apply here -- so law enforcement and |

---

[17] Ex. "I", ▮▮▮▮▮▮▮▮▮▮
[18] Ex. "J", ▮▮▮▮▮▮▮▮▮▮
[19] Ex. "K", Hearing Transcript, 8/12/21, at 16:18-17:6.
[20] Ex. "L", ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[21] Ex. "L", ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[22] Ex. "K", Hearing Transcript, 8/12/21, at 16:18-17:6.



While each of these examples demonstrates how Salesforce has attempted to obfuscate the truth, the cumulative effect of Salesforce's efforts has resulted in some courts rendering opinions that are completely divorced from the actual facts.  Recently, Judge Wood of the United States District Court for the Northern District of Illinois, Eastern Division, issued an opinion in which it granted a motion to dismiss that made similar arguments to what Salesforce argued in this case.  Unfortunately for the plaintiffs in Chicago, the court did not allow discovery.[24]  Instead, Judge Wood indulged several inferences in Salesforce's favor; however, the evidentiary examples referenced below either contradicts such inferences or is of such a nature that a reasonable

---

[23] Ex. "L", ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[24] Plaintiffs in the GG case argued that, as Judge Hanen did, "discovery should be taken to find out what Salesforce actually did, what its software did, what it knew at the time, for example, which also goes to other claims in the case but really to find out what the software was doing and what Salesforce knew about the business, what customization had been made." Ex. "M," Hearing Transcript, *G.G. v. Salesforce, et al.*, in the United States District Court, Northern District of Illinois, Eastern Division, at 47:20-25.

inference should have been drawn that differs from the one chosen by the court without evidence.

By way of example, Plaintiffs would point to the following findings by Judge Wood:[25]

> Plaintiffs contend that they have plausibly alleged that Salesforce did not just sell Backpage off-the-shelf software but instead also offered Backpage "personalized support." Yet, although the complaint contains multiple mentions of Salesforce providing Backpage with "personalized services tailored specifically to the needs of its illegal business," *Plaintiffs provide no examples of these services, or description, or even suggestion, of how Salesforce altered its software to better facilitate sex trafficking.*

> [T]he mere fact that the Enterprise CRM edition is customizable (that is, capable of being customized) *does not, without more, support a reasonable inference that Salesforce actually customized the software to meet Backpage's needs.* In sum, Plaintiffs have failed to allege facts supporting that Salesforce "took part in" Backpage's sex-trafficking venture.

In considering these findings, a review of the transcript is telling because Judge Wood's

opinion appears to track several arguments put forth by Salesforce's counsel:[26]

> As described in its website, the Enterprise edition is fully customizable," – not customized to their needs but just customizable by them -- "providing a deeply-customizable sales CRM for Backpage's business of prostitution and sex trafficking."

> So let's go to the actual thing that they're citing here and quoting from. This is what's supporting. This is the URL that was cited in their footnote for that quote. It's literally a pricing page of the sort that you would see on an airplane when you're buying the Internet. It's like the different models you can get, how much you pay. One-fifty is the Enterprise edition, most popular, deeply-customizable sales CRM for your business.

It is difficult to imagine that Judge Wood could have come to the same conclusions at the

pleading stage if she had the benefit of the same discovery that has come to light in this litigation.

Instead, she appears to have relied on the representations of Salesforce counsel.

---

[25] Ex. "N," Memorandum Opinion and Order (Dkt. 105), *G.G. v. Salesforce, et al.*, in the United States District Court, Northern District of Illinois, Eastern Division, at pgs. 33-34 (emphasis added).
[26] Ex. "M," Hearing Transcript, *G.G. v. Salesforce, et al.*, at 31:1-13.

Fortunately for the Plaintiffs, this Court has allowed limited discovery, which will allow the applicability of the CDA to the claims against Salesforce to be determined on the merits because the limited discovery to date shows that Salesforce was indeed involved in the customization and implementation of Backpage's CRM. ███████████████████████

████████████████████████████████████ ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

The limited evidence discovered in this case begs the question – would Judge Wood have made the same findings had she had the benefit of this evidence?  This is an important question because what recently occurred in Judge Wood's court is only one of many examples of Salesforce trying to have claims against it dismissed without the benefit of any discovery.  On March 24, 2022, Salesforce filed a Petition for Writ of Mandamus with the Texas Supreme Court, seeking to overturn the ruling of Judge Mark Davidson in the Texas MDL that Salesforce requested.

---

[27] Ex. "O", ████████████████████
[28] Ex. "P", █████████████

In its briefing to the Texas Supreme Court,[29] Salesforce claims that "plaintiffs seek to hold Salesforce liable for nothing more than selling Backpage a subscription to the same customer relationship management software that it has sold to tens of thousands of other businesses." Throughout its brief, Salesforce repeats this argument, claiming it simply provided "neutral tools."[30]  But as demonstrated above, the limited discovery in this matter has revealed numerous instances in which *Salesforce itself* provided customized services specific to Backpage, accessed Backpage's data, and provided implementation services to Backpage.

Unfortunately, due to the Protective Order currently in place in this Court, Plaintiffs are unable to share these basic facts with other litigants, even those represented by counsel for Plaintiffs in this case.  As a result, Courts like the district court in Chicago may dismiss complaints where Plaintiffs cannot provide "*examples of these services, or description, or even suggestion, of how Salesforce altered its software to better facilitate sex trafficking.*"[31]

Because there are currently multiple motions by Salesforce that are fully briefed and ripe for consideration, Plaintiffs seeks modification to allow sharing so that courts can, at a minimum, base their opinions on the actual facts.

### 3.  The lack of sharing is prejudicial to Plaintiffs.

In addition to the obvious prejudice of Salesforce obtaining rulings that are based on less than the truth, there are other prejudicial effects that result from the current Protective Order.  The most apparent prejudice is that the inability to share extends litigation unreasonably and unnecessarily and makes it more expensive for Plaintiffs. For example, Plaintiffs may receive documents in this case that are marked 1-50.  And then receive those exact same documents in

---

[29] Ex. "Q", Salesforce's Petition for Writ of Mandamus, filed on 3/24/22, at pg. 8.
[30] *Id.*, at pg. 16.
[31] Ex. "N," Memorandum Opinion and Order (Dkt. 105), *G.G. v. Salesforce, et al*, at pgs. 33-34 (emphasis added).

another case that are marked 41-90.  Even though they are the exact same documents, any expert hired by Plaintiffs has to double their work to review two separate sets of the same documents, or otherwise an expert would be in violation of the Protective Order.  Such an absurd result should not result from a protective order that is designed to protect Salesforce from the disclosure of legitimately protected documents.  Sharing would prevent Salesforce from be able to wield the Protective Order as both sword and shield, while also promoting judicial efficiency and economy.

    **4.  Sharing is warranted in these circumstances; therefore, the Court should modify the current Protective Order to allow sharing.**

As discussed above, opinions are being issued that are not based on the actual facts. Plaintiffs, consistent with this Court, believe that the applicability of the CDA to human trafficking claims against Salesforce should be based on the truth.  While Salesforce should have no problem with the concept of Courts determining matters based on facts, it is now apparent that the actual facts contradict the narrative that Salesforce has used to escape liability and discovery for so long. There are lawyers in the cases pending in front of this Court who also represent the plaintiff in the recent opinion from Chicago, which was obviously not based on the facts.  As a result of the current Protective Order, those lawyers are not permitted to share the facts they learn in this case with other clients or courts.  Such a result cannot be allowed as it will create a miscarriage of justice. The only way to thwart such a result is though modification of the Protective Order to allow sharing, which is well-rooted in the law.

A protective order that allows the parties to share the fruits of their labors in the discovery process is appropriate to protect a defendant's interests and also serves the interests of the parties as well as the interests of justice, and this view is widely shared by courts in Texas and across the country:

- **Manual of Complex Litigation, § 21.431** ("Protective orders may, of course, authorize

disclosure of confidential documents to counsel in other related cases ... [because] discovery already completed should ordinarily be made available to litigants in the other cases.")[32]

- **Miller, Arthur, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 497 (1991)**: ("It is difficult and indeed unwise to have an absolute prohibition on discovery sharing, given the extraordinarily high cost of litigation and the reality that discovery accounts for the largest component of that expenses in many cases. Barring sharing smacks too much of requiring each litigant to reinvent the wheel and not surprisingly it has been rejected on that basis by some courts. As Judge Wisdom has put it, there 'is no reason to erect gratuitous roadblocks in the path of a litigant who finds a trail blazed by another…'" citations omitted)

- **Texas Supreme Court:** "Shared discovery is an effective means to insure full and fair disclosure" because parties "subject to a number of suits concerning the same subject matter are forced to be consistent in their responses by the knowledge that their opponents can compare those responses."[33]

- **Texas Supreme Court:** Moreover, shared discovery makes the judicial system "more truthful" and "more efficient." *Id.* Accordingly, "public policies favoring shared information require that any protective order be carefully tailored to protect [a party's] proprietary interests while allowing an exchange of discovered documents."[34]

- **Texas Supreme Court:** "the fruits of discovery are available not only to the parties in a particular case but may be disseminated in turn to other litigants and potential litigants".[35]

- **U.S. District Court, Southern District of Texas:** "Federal courts have 'overwhelmingly embraced' this practice to streamline discovery and promote access to court proceedings."[36]

- **U.S. District Court, Western District of Texas:** "Such collaboration among plaintiffs' attorneys would come squarely within the aims of the Federal Rules of Civil Procedure – to secure the just, speedy and inexpensive determination of every action . . . there is nothing inherently culpable about sharing information obtained through discovery. The availability of the discovery information may reduce time and money which must be expended in similar proceedings, and may allow for effective, speedy and efficient representation."[37]

---

[32] Manual for Complex Litigation § 21.431, at 53 n. 61 & § 31.13, at 258 (2d 1985).
[33] *Garcia v. Peeples*, 734 S.W.2d 343, 347-48 (Tex. 1987).
[34] *Garcia v. Peeples*, 734 S.W.2d 343, 347-48 (Tex. 1987).
[35] *Eli Lilly & Co. v. Marshall*, 850 S.W.2d 155 (Tex. 1993) (orig. proceeding).
[36] *Idar v. Cooper Tire & Rubber Co.*, No. C–10–217, 2011 WL 688871, at *3 (S.D. Tex. Feb. 17, 2011).
[37] *Patterson v. Ford Motor Co.*, 85 F.R.D. 152, 154 (W.D. Tex. 1980).

Outside of Texas, this favorable view of shared discovery has been adopted across a wide range of cases in many different jurisdictions across the country:

- Proceedings of the 51st Judicial Conference of the District of Columbia, 134 F.R.D. 321, 389-90 (1991): ("The reason [the proliferation of secrecy orders] is such a terrible problem is several-fold. First, the immediate effect that it has on the judicial system is that everybody who represents the plaintiffs has to reinvent the wheel. The defendants know this. That is why they ask for it .... But a far more egregious effect – talk about just, speedy and inexpensive determination of justice – is judges have to, over and over and over again, resolve the same discovery disputes in courts throughout the country.").

- *Charter Oak Fire Ins. Co. v. Electrolux Home Prods., Inc.*, 287 F.R.D. 130, 134 (E.D.N.Y. 2012) ("allowing the sharing of discovery among related cases is an efficient and effective means of avoiding duplicative and costly discovery, as well as avoiding unnecessary delay in the adjudication of cases");

- *Comes v. Microsoft Corp.*, 775 N.W.2d 302, 311 (Iowa 2009) ("The enormous and escalating cost of civil litigation, in this case and many others, runs a great risk of placing redress in the ... courts beyond the reach of all but the most affluent," which "can partially be averted by allowing for shared discovery among similarly situated plaintiffs" because "the overwhelming waste of private and judicial resources that would be avoided if the [similarly situated] plaintiffs were allowed access to the ... discovery," which "also advances the important objectives of disclosure and efficiency in the trial system ... to make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.");

- *Miller v. General Motors Corp.*, 192 F.R.D. 230, 232 (E.D. Tenn. 2000) ("Certainly, General Motors' attorneys who may be defending similar cases across the country are not required to tell plaintiffs' attorneys what documents they are sharing in order to defend lawsuits of this type. Identifying the specific documents shared would invade an attorney's work product qualified privilege and would also encourage the sharing attorneys to share more documents than were necessary in order to provide "cover." ... Additionally, since General Motors will not know during the pendency of this litigation the attorneys who might be recipients of shared information, this will encourage General Motors to be careful with regard to completeness and uniformity of its production of discovery in all similar cases.");

- *Wolhar v. General Motors Co.*, 712 A.2d 464, 467 (Del. Super. Ct. 1997) ("the goal of sharing or using discovery materials developed in one case with the litigants of another is appropriate under our rules of civil procedure which "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action," and the "great weight of authority in other jurisdictions holds that such sharing is not only theoretically sound but also justified as an efficient use of the resources of the courts and the parties" which "is particularly appropriate where multiple individual plaintiffs assert essentially the same alleged wrongs against a national manufacturer of a consumer product.");

- *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 789-90 (3rd Cir. 1994) ("This case thus illustrates how confidentiality orders can frustrate, if not render useless, federal and state freedom of information laws. ... there arises a troublesome conflict between the governmental entity's interest as a litigant and its public disclosure obligations.");

- *Jochims v. Isuzu Motors, Ltd*., 148 F.R.D. 624, 630-31 (S.D. Iowa 1993), *opinion modified*, 151 F.R.D. 338 (S.D. Iowa 1993) (if sharing discovery "can place private litigants in a position they would otherwise reach only after repetition of another's discovery, such modification can be denied only where it would tangibly prejudice substantial rights of the party opposing modification. ... it makes little sense to require each of Petitioners to trod the footsteps left by Jochims' counsel in the sands of this case's protracted discovery in order merely to obtain duplicative discovery; discovery which more easily and less expensively could be obtained by modification of the protective order in this case," which results in substantial savings of time and money to litigants in related cases against Isuzu, but also results in considerable saving of judicial resources.");

- *Wauchop v. Domino's Pizza, Inc*., 138 F.R.D. 539, 546–47 (N.D. Ind. 1991) ("The risk— or in this case, the certainty—that the party receiving the discovery will share it with others does not alone constitute good cause for a protective order. ... Collaborative use of discovery material fosters that purpose; the sharing of discovery materials ultimately may further the goals of Rule 1 by eliminating the time and expense involved in 're-discovery'" and "efficient administration of justice should encourage such practices.");

- *United Nuclear Corp*., 905 F.2d 1424, 1427-28 (10th Cir. 1990), *cert. denied*, 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991) ("when a collateral litigant seeks access to discovery produced under a protective order, there is a countervailing efficiency consideration—saving time and effort in the collateral case by avoiding duplicative discovery. In striking this balance, ... [w]e find ourselves in agreement with the" courts that "have tipped the balance in favor of avoiding duplicative discovery ... . Defendants' desire to make it more burdensome for" non-parties to share discovery in "their collateral litigation is not legitimate prejudice.");

- *Baker v. Liggett Group, Inc*., 132 F.R.D. 123, 126 (D.Mass. 1990) ("to routinely require every plaintiff ... to go through a comparable, prolonged and expensive discovery process would be inappropriate.");

- *Deford v. Schmid Products Co*., 120 F.R.D. 648, 654 (D. Md. 1987) ("The plaintiffs' primary argument in favor of disclosure is their desire to share information with other litigants and counsel. This is an appropriate goal under the Federal Rules of Civil Procedure, which are intended 'to secure the just, speedy, and inexpensive determination of every action.' Sharing discovery materials may be particularly appropriate where multiple individual plaintiffs assert essentially the same alleged wrongs against a national manufacturer of a consumer product.");

- *Cipollone v. Liggett Group, Inc*., 113 F.R.D. 86, 87 (D.N.J. 1986), *mandamus denied*, 822 F. 2d 335 (3d Cir. 1987), *cert. denied*, 484 U.S. 976 (1987) ("requiring each plaintiff in every similar action to run the same gauntlet over and over again serves no useful purpose other than to create barriers and discourage litigation.");

- *Ward v. Ford Motor Co*., 93 F.R.D. 579, 580 (D. Colo. 1982) (discovery sharing "reduces the effort and expense inflicted on all parties, including [the defendant], by repetitive and unnecessary discovery" and such "means of minimizing discovery costs improves the accessibility and economy of justice" and "[e]ach plaintiff should not have to undertake to discovery anew the basic evidence that other plaintiffs have uncovered" which "would be tantamount to holding that each litigant who wishes to ride a taxi to court must undertake the expense of inventing the wheel" when "justice requires that courts encourage, not hamstring, information exchanges such as that here involved.");

- *U.S. v. Hooker Chemicals & Plastics Corp*., 90 F.R.D. 421, 426 (E.D. N.Y. 1981) ("Use of the discovery fruits disclosed in one lawsuit in connection with other litigation, and even in collaboration among plaintiffs' attorneys, comes squarely within the purpose of the Federal Rules of Civil Procedure. Such cooperation among litigants promotes the speedy and inexpensive determination of every action as well as conservation of judicial resources.");

- *Wilk v. AMA*, 635 F.2d 1295, 1299-1301 (7th Cir. 1980) (noting the "wastefulness" of duplicate discovery, and agreeing with "every other appellate court which has considered the issue" that modification of existing protective orders to permit access by other litigants should be permitted because "when litigants seek to use discovery in aid of collateral litigation on similar issues, for in addition to the abstract virtues of sunlight as a disinfectant, access in such cases materially eases the tasks of courts and litigants and speeds up what may otherwise be a lengthy process.").

A court has discretion to modify a protective order it has entered as long as the order remains in effect. *Peoples v. Aldine Indep. Sch. Dist.*, No. CIV. A. 06-2818, 2008 WL 2571900, at *2 (S.D. Tex. June 19, 2008). In determining whether to modify a protective order, courts consider four factors: "1) the nature of the protective order, (2) the foreseeability, at the time of issuance of the order, of the modification requested, (3) the parties' reliance on the order; and most significantly (4) whether good cause exists for the modification." *Id.* (quoting *Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.,* 234 F.R.D. 175, 179 (N.D.Ill.2006). "Good cause" in this context requires "changed circumstances or new situations" warranting modification of a protective order and includes the need to make information available for use in subsequent or related proceedings. *Id.*

In determining whether the moving party has established good cause, "the court must weigh that party's need for modification against the other party's need for protection, and ought to factor in the availability of alternatives to better achieve both sides' goals." *Id.*, at 3.  In this case, Plaintiffs seek a simple modification that also provides protections for Salesforce. The facts of this case and related litigation against Salesforce have created "changed circumstances" or "new situations" since the time the protective order was originally entered; therefore, good cause exists for modification to allow sharing.

With this background in mind, Plaintiffs respectfully request, pursuant to paragraph 17 of the Stipulated Protective Order (Dkt. 8), that the Court modify the current provisions to allow sharing with "litigants or attorneys for a litigant involving similar allegations of the facilitation of human trafficking against Salesforce."  Alternatively, Plaintiffs respectfully request that the Court, at an absolute minimum, revise the current Protective Order to allow counsel for litigants in this case to share with themselves in other cases involving allegations of the facilitation of human trafficking against Salesforce.

## STATUS OF DISCOVERY

As the Court knows, it initially allowed limited discovery on the applicability of Section 230 on July 7, 2021, giving Salesforce 90 days until October 5, 2021, to file a summary judgment. Immediately after this Court's instructions, Plaintiffs requested depositions on July 8, 2021, and served written discovery on July 12, 2021. After several disputes and based on the representation by counsel for Salesforce that responsive document production was complete, the depositions of John Jackson and Mark Raymo were taken on November 9 and 11, 2021, respectively.  Those depositions revealed that discovery by Salesforce was not complete.

Since then, there have been multiple filings and letters exchanged with the Court, including Plaintiffs' Third Motion to Compel filed on November 23, 2021. The Court conducted a hearing on that Motion on January 27, 2022 and ordered Salesforce to produce certain materials.[38]  While some discovery was exchanged, there was a dispute between the parties about the scope of the Court's instructions from January 27, 2022. On March 18, 2022, Salesforce first represented that its production was complete.[39]  However, on March 22, 2022, the Court entered a subsequent Order clarifying the disputed issues and requiring additional production from Salesforce. (Dkt. 142). Salesforce produced additional documents on March 25, 2022.

Although Plaintiffs believed there were still deficiencies with Salesforce's production, Plaintiffs began requesting dates and locations for Mr. McLaughlin's deposition on April 21, 2022 and followed-up on April 25 and May 10, 2022.[40]   On May 19, 2022, Salesforce finally provided dates in July for Mr. Mclaughlin's deposition to take place in Ireland, and Plaintiffs promptly requested a location to notice that deposition. On May 23, 2022, Salesforce informed Plaintiffs' counsel that Mr. McLaughlin was available on either July 14 or 15, 2022 for his deposition in either Connecticut or New York City.  Plaintiffs responded that they would work with Salesforce to accommodate Mr. McLaughlin.  On June 1, 2022, Plaintiffs noticed the deposition of Mr. McLaughlin to take place on July 15, 2022, in Stamford, Connecticut.

<u>**CONCLUSION**</u>

For the reasons described above, Plaintiffs respectfully request that the Court conduct an oral hearing on this matter, and that the Court modify the Stipulated Protective Order (Dkt. 80) to allow sharing.

---

[38] Ex. "R", 1/27/22 Hearing Transcript.
[39] Ex. "S", Discovery e-mail chain.
[40] *Id.*

Respectfully submitted,

By:       /s/ *Jeffrey H. Richter*
Annie McAdams
Texas Bar No. 24051014
S.D. Tex. No. 1514589
ANNIE MCADAMS, PC
1150 Bissonnet
Houston, Texas 77005
Phone: (713) 785-6262
Fax:    (866) 713-6141
annie@mcadamspc.com

THE GALLAGHER LAW FIRM
Michael T. Gallagher
Texas Bar No. 07586000
Pamela McLemore
Texas Bar No. 24099711
2905 Sackett Street
Houston, Texas 77098
Phone: (713) 222-8080
Fax :   (713) 222-0066
mike@gld-law.com
pamm@gld-law.com

SICO HOELSCHER HARRIS LLP
David E. Harris
Texas Bar No. 24049273
S.D. Tex. No. 712461
Craig M. Sico
Texas Bar No. 18339850
Federal I.D. No. 13540
Jeffrey H. Richter
Texas Bar No. 24061614
Federal I.D. No. 1794395
802 N. Carancahua, Ste. 900
Corpus Christi, Texas 98401
Phone: (361) 653-3300
Fax:    (361) 653-3333
dharris@shhlaw.com
csico@shhlaw.com
jrichter@shlaw.com

BRACEWELL LLP
Warren W. Harris
State Bar No. 09108080
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: (713) 221-2300
Fax:     (800) 404-3970
Warren.harris@bracewell.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that on May 24, 2022, counsel for Salesforce indicated that they oppose the relief sought in this Motion.

_/s/ Jeffrey H. Richter_
JEFFREY H. RICHTER

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 8th day of June 2022, a true and correct copy of the above and foregoing document was served upon all counsel of record via the Court's electronic filing system in accordance with the Federal Rules of Civil Procedure.

_/s/ Jeffrey H. Richter_
JEFFREY H. RICHTER