United States District Court
Southern District of Texas
**ENTERED**
November 20, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| A.B., *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| v. | § | CIVIL ACTION NO. 4:20-cv-1254 |
| | § | |
| SALESFORCE, INC., | § | |
| | § | |
| *Defendant*. | § | |

## SEALED ORDER

Before the Court is Defendant Salesforce, Inc.'s ("Salesforce" or "Defendant") Motion for Summary Judgment (Doc. No. 160). Plaintiffs A.B. and J.F. (collectively, "Plaintiffs") responded in opposition (Doc. No. 169) and Salesforce replied (Doc. No. 171). Having considered the briefs and applicable law, the Court hereby **DENIES** Defendant's Motion for Summary Judgment.

### I.     Factual Allegations & Procedural Background[1]

This case centers on the question of whether an entity may be held liable for allegedly benefitting from and facilitating sex trafficking when it provides software tools and related support services to a website utilized by sex traffickers.

Plaintiffs A.B. and J.F. are allegedly sex trafficking victims who were sold for unlawful sex acts through advertisements on Backpage.com, LLC ("Backpage") in 2014 and 2018, respectively.[2] (Doc. No. 96 at 12).

Backpage was established in 2004 as an online marketplace for goods and services. Backpage's website also allowed classified advertisements for sex related activities. Over time,

---

[1] The facts discussed in this section are primarily derived from Plaintiffs' current Complaint for the purpose of establishing a foundational background for this Order and are not findings of fact or conclusions of law made by this Court. *See* (Doc. No. 96, Plaintiffs' Fourth Amended Complaint).

[2] Other than providing the years, the Fourth Amended Complaint provides very little information about the traffickers or the trafficking events.

Backpage became a popular online classified site for adult advertisements and derived a large portion of its revenue from such advertisements. As early as 2008, Backpage had been publicly identified by state and federal officials and law enforcement as being associated with sex trafficking. (Doc. No. 96 at 7). Various efforts, including one by a group of state attorneys general in August 2011, were made to shut down Backpage's adult services section. Backpage continually resisted these efforts and refused to do so on First Amendment grounds. *See G.G. v. Salesforce.com, Inc.*, 603 F.Supp.3d 626, 631 (N.D. Ill. 2022).

As Backpage grew its business, it needed support to manage customer demand and maintain its platform. Backpage contacted Salesforce, representing that it was a "classified ads business . . . exactly like Craigslist" and that it was looking for customer relationship management software to manage its growth. (Doc. No. 160 at 8). Salesforce was at the time, and is today, a company that promotes business growth for its clients through its Customer Relationship Management ("CRM") system. It provides customers "marketing consultation and implementation, financial processing implementation and support, bespoke analytics and other applications and technology." (Doc. No. 96 at 9). Specifically, Salesforce sells "software as a service" technology that helps businesses organize customer data, communicate internally and with customers, track business intelligence analytics, and manage marketing and sales functions. In addition to helping its customers reach their business goals, Salesforce on occasion provides customers with personalized support for the use of Salesforce's platforms.

A Backpage affiliate signed the first contract with Salesforce in late 2013. (*Id.* at 10). Over time, Backpage subscribed to four of Salesforce's software products: (1) data storage, that was required for businesses to access Salesforce products, servers, and data; (2) Sales Cloud Enterprise Edition ("Sales Cloud"), a "sales tool" that "tracks sales engagements," which allows businesses

2

to upload, store, and organize customer and sales information on Salesforce's servers; (3) Force.com, which allows businesses to create apps that streamline routine tasks; and (4) Pardot, a "marketing automation tool" that allows businesses to send email marketing campaigns and track customer engagement and responses. (Doc. No. 160 at 8).

According to Plaintiffs' Fourth Amended Complaint, Salesforce "chose to financially benefit by doing business with Backpage, the largest sex trafficker in modern history." (Doc. No. 96 at 10). Plaintiffs allege that Backpage "sought a partnership [with Salesforce] that would assist in growth objectives as well as concealing their activity." They allege that during the course of Salesforce and Backpage's business relationship, Salesforce "sold and supported targeted solutions essential for Backpage's operational needs" and was a "driving force" in enabling Backpage to grow its operations. (*Id.* at 9–10).

In addition to providing its software and support to Backpage, Plaintiffs claim Salesforce also helped Backpage "evade law enforcement." (Doc. No. 169 at 15). While Backpage was under intense law enforcement scrutiny in 2015, Backpage asked Salesforce to sell to it, and assist in the setup of, a duplicate "clone" of its system so that it could begin operating in Europe with the same software system it was already using in the United States. (*Id.* at 23). Eventually, following Backpage's seizure by the Department of Justice in April 2018, Salesforce's relationship with Backpage ended. (*Id.* at 33). Later in April, Backpage pleaded guilty to human trafficking in Texas. (*Id.* at 9).

In this case, Plaintiffs plead they were victims of sex trafficking and brought, among other claims, causes of action against both Backpage and Salesforce for knowingly benefitting from and facilitating sex trafficking under 18 U.S.C. § 1595(a), otherwise known as the Trafficking Victims

3

Protection Act of 2000 (TVPA), and for similar violations pursuant to Chapter 98 of the Texas Civil Practice and Remedies Code. (Doc. No. 96 at 13–19).

In their claims against Backpage, Plaintiffs alleged that they were trafficked for sex through illegal advertisements posted to Backpage.com, and that Backpage was responsible for hosting, accepting money for, and editing advertisements to mask the illegal nature of the situation. Plaintiffs eventually dismissed Backpage from the case. (Doc. Nos. 135, 139).

As to their claims against Salesforce, Plaintiffs allege that Salesforce supplied tools, support, and software resources to Backpage, and thus aided Backpage in sex trafficking efforts. Plaintiffs allege Salesforce violated federal and state anti-trafficking laws by selling its "tools and operational support" to Backpage and that it knew or should have known that Backpage was under investigation for sex trafficking.

Initially, Salesforce filed a Motion to Dismiss. (Doc. No. 23). In that Motion to Dismiss, Salesforce maintained that Plaintiffs were seeking to hold Salesforce liable for the criminal acts of Backpage and that Plaintiffs' allegations did not establish that Salesforce participated in sex trafficking. Salesforce further argued that Plaintiffs' claims were barred by § 230 of the Communications Decency Act ("CDA") because Salesforce was a provider of an "interactive computer service" and no exception to this § 230 immunity applied. (*Id.* at 7) (citing 47 U.S.C. § 230).

This Court granted in part and denied in part Salesforce's Motion to Dismiss and found that, at the dismissal stage of the litigation, it could not hold as a matter of law from the record before it that § 230's protections apply to Salesforce. (Doc. No. 58) (quotations omitted). At the time, it appeared that this topic would be more suitably addressed by a Rule 56 motion. At the Plaintiffs' request, this Court allowed discovery on the issues of whether § 230 and/or its

4

exceptions applied to Plaintiffs' claims. (Minute Entry, July 6, 2021; Doc. Nos. 73, 77, 88). The Court did, however, grant Salesforce's Motion to Dismiss as to Plaintiffs' negligence, gross negligence, and civil conspiracy claims. (Doc. No. 58 at 7–11).

Subsequently, Salesforce filed this Motion for Summary Judgment, arguing that § 230 bars Plaintiffs' claims and no exception to the statute applies. (Doc. No. 160 at 10). Specifically, Salesforce argues that: (1) it provided interactive computer services that are encompassed under the plain text of § 230, and thus is immune from suit under the statute; (2) Plaintiffs' claims are barred by § 230 because they stem from the publication by Backpage of information created by third parties; and (3) Plaintiffs do not fall under the few exceptions Congress has connected to § 230 immunity. (*Id.* at 10–11). Plaintiffs responded in opposition (Doc. No. 169) and Salesforce replied (Doc. No. 171). Both sides have filed supplemental authorities. (Doc. Nos. 179, 185). Additionally, Plaintiffs filed a motion to reopen discovery and leave to amend their summary judgment response. (Doc. No. 187). Salesforce filed a response (Doc. No. 194), Plaintiffs filed a reply (Doc. No. 197), and Salesforce filed a surreply (Doc. No. 205).

## II. Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

### III.   Background on the Communications Decency Act (CDA)

In the 1990s, Congress recognized the rapid emergence and development of the Internet and the possible benefits generated by having various forums and providers available to the public. *See* 47 U.S.C. § 230(a) (acknowledging that such forums allow for "diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity" and have "flourished …with a minimum of government regulation"). In light of these findings and the need for a statute that would both embrace the new frontier that the Internet posed and also address its limitations, Congress enacted the Communications Decency Act (CDA) in 1996. The CDA had twin aims. On one hand it was enacted to protect minors and to limit their exposure—and the general public's exposure—to the online transmission of obscene and indecent speech. *See* 47 U.S.C. § 223(a); *see also Woodhull Freedom Found. v. United States*, 948 F.3d 363, 367 (D.C. Cir. 2020). On the other hand, it sought to protect the growth of what was becoming an important and emerging sector of the nation's economy—the Internet.

To further address the latter goal, when enacted, the CDA included § 230, which shields providers of "interactive computer services" from liability for speech posted by third parties. Section 230(c)(1) states, "[n]o provider or user of an interactive computer service *shall be treated* as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Congress enacted § 230 to facilitate growth and innovation of the Internet in its early years, to "promote the continued development of the Internet and other interactive computer services" and to encourage development of the Internet's "vibrant and competitive free market." Telecommunications Act of 1996, Pub. L. No. 104-104, § 509, 110 Stat. 56, 138 (codified at 47 U.S.C. § 230(b)(1-2)). Section 230 remains in effect today.

As a general rule, § 230 immunizes entities like Facebook, YouTube, and Craigslist from liability for content that is posted on their sites by third parties. The statute provides immunity to these providers of "interactive computer service[s]" and states they shall not "be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Accordingly, absent any exemptions, § 230 will shield a defendant from liability as long as the defendant can show that: (1) it is a provider or user of an interactive computer service and (2) the claims against it seek to treat it as a speaker or publisher of a third party's content.

### IV. Is Salesforce a Provider of Interactive Computer Services?

The parties have long disputed whether Salesforce is a provider of an "interactive computer service" under § 230. Salesforce contends that it is a provider of an interactive computer service because Salesforce falls under the definition of an "access software provider."[3] Specifically,

---

[3] The CDA defines "Access Software Provider" as "a provider of software (including client or server software), or enabling tools that ... (A) filter, screen, allow or disallow content; (B) pick, choose, analyze, or digest content; or (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." 47 U.S.C. § 230(f)(4).

7

Salesforce contends it is an access software provider because its software "enables computer access by multiple users to a computer server" and allows users to "analyze, transmit and receive, display, cache and search, and organize content." (Doc. No. 160 at 12–13).

First, Salesforce contends it is an access software provider under § 230(f) because it "provides access to software and tools that manipulate content and because it enables multiple users to access a computer server via the internet." (*Id.* at 13). To support this contention, Salesforce cites to the depositions of John Jackson ("Jackson"), Senior Director of Product and Pricing Operations at Salesforce, and Mark Raymo ("Raymo"), Corporate Representative and Account Executive at Salesforce. Both testified that a defining feature of each Salesforce product is that it is "cloud[]based," meaning the software and relevant client company's data is located on a computer server that users access using the Internet. (Depo. of John Jackson, Doc. No. 161-1, Def. Ex. 1 at 103:7–17; Depo. of Mark Raymo, Doc. No. 161-5, Def. Ex. 5 at 181:24–182:1). Jackson also testified that "when you purchase Salesforce [software], you're getting access to [Salesforce's] servers." (Depo. of John Jackson, Doc. No. 161-1 at 70:19–23). Based on this testimony, Salesforce contends that it qualifies as an access software provider because it provides users access to a server through the Internet within the definition of § 230(f).

Second, Salesforce argues that it is an access software provider because its software and tools can perform seven of the eighteen tasks that § 230(f)(4)(A)-(C) uses to define such providers. To support this contention, Salesforce again cites to Jackson's deposition, where he testified that Sales Cloud software "allows a user to analyze, transmit and receive, display, cache and search, and organize content about a business's customers, such as their contact information and data about their purchasing patterns." (*Id.* at 72:20–73:4, 73:12–24). Salesforce also cites to its website description of its Pardot marketing software, which states that the software "transmits" content by

8

permitting customers to send email marketing campaigns and the software "analyzes" the success of those campaigns. (Doc. No. 161-10 at 2).

Salesforce also references decisions from other courts that have found that it qualifies as a provider of interactive computer services under the plain text of § 230. (Doc. No. 160 at 14). *See G.G. v. Salesforce.com, Inc.*, 603 F.Supp.3d 626 (N.D. Ill. May 16, 2022) (reversed and remanded on other issues) (hereinafter, *G.G. I*); *Does #1-50 v. Salesforce.com, Inc.*, 2021 WL 6143093, at *5–6 (Cal. Ct. App. Dec. 30, 2021). The *G.G. I* court stated that "Salesforce, through its software, provided multiple users access to a set of enabling tools that allow those users to analyze, organize, arrange, transmit, and display content by a third-party . . . This description, which aligns with the statutory definition, unambiguously establishes that Salesforce is an 'interactive computer service.'" *G. G. I* at 634.

Salesforce also references rulings in which similar entities were found to be interactive computer service providers where those companies provided "back-office software or infrastructure." (Doc. No. 160 at 14). Salesforce argues that, in those cases, the plaintiffs' claims stemmed from content posted on someone else's website, and the provider generally had no connection to the website on which the harmful content is posted. (*Id.*). According to Salesforce, courts have also held that companies that provide web hosting services are immune from claims stemming from content posted on websites owned and controlled by others. (*Id.* at n. 11) (citing *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 27–28 (2d Cir. 2015) (website host GoDaddy was dismissed from case where union distributed defamatory newsletters); *Johnson v. Arden*, 614 F.3d 785, 790–92 (8th Cir. 2010) (where defamatory statements are posted on ComplaintsBoard.com, interactive service provider InMotion is not originator of damaging material and immune under § 230); *Doe v. GTE Corp.*, 347 F.3d 655, 658–62 (7th Cir. 2003)

9

(noting that a web host is "an intermediary and [is] indifferent to the content" the website transmits, and that "[e]ven entities that do know the information's content do not become liable").

Therefore, based on its summary judgment evidence, and buoyed by holdings from other courts, Salesforce maintains that the record establishes that it is an access software provider and thus an interactive computer service provider for purposes of § 230.

In response, Plaintiffs argue that § 230 does not apply to Salesforce. Specifically, Plaintiffs argue that Salesforce is not an access software provider because § 230(f)(4)(C) requires access software providers to perform tasks with respect to *publicly accessible content*, not the privately stored content with which Salesforce deals. *See* 47 U.S.C. § 230(f)(4)(C) ("transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate *content*") (emphasis added). According to Plaintiffs, when § 230 was enacted, it was "not concerned with information stored privately like customer data." (Doc. No. 169 at 19). Section 230, Plaintiffs contend, was enacted with the intent of protecting children from obscene content posted online. (*Id.*). Thus, Plaintiffs argue that Salesforce's understanding and use of "content" improperly includes privately stored content, which fails to align with the original congressional intent of § 230. (*Id.* at 17).

According to Plaintiffs' interpretation of § 230(f)(4)(C), "the undisputed facts establish that Salesforce's software took no action with respect to any [publicly accessible] 'content.'" (*Id.* at 18). Plaintiffs do not cite to any authority to support this interpretation of § 230. Instead, Plaintiffs argue that although Salesforce claims its software performs seven of the eighteen functions of an access software provider, the software Salesforce provided to Backpage was for Backpage's internal use and did not involve data accessible to public internet users. (*Id.* at 17–18). For example, Plaintiffs maintain that Salesforce's argument that its Pardot software "transmitted" content because it is capable of sending marketing emails and "analyzed" the success of those

10

marketing efforts constitutes the processing of purely private data and information. (*Id.*). Plaintiffs argue that none of the actions Salesforce's software performs involve the "content" at issue in this case—third-party trafficking advertisements that were publicly accessible on Backpage—because this content was posted by the traffickers on Backpage, rather than through a product sold by Salesforce. Moreover, Plaintiffs argue that "[i]f Salesforce's position were correct, any software company would qualify as an 'access software provider' because all software processes some form of data." (*Id.* at 18).

Next, Plaintiffs maintain that Salesforce does not qualify as an access software provider under § 230(f)(4)(A)-(C) because Salesforce did not host the Backpage platform or develop or enable third parties to post publicly accessible content to Backpage. According to Plaintiffs, Salesforce did not "filter," "screen," "choose," "display," or otherwise manipulate Backpage content as it claims. To support these contentions, Plaintiffs cite to Raymo's deposition, where he testified that Salesforce's software does not: (1) host third-party websites (Doc. No. 161-5 at 133:20–134:8); (2) enable users to post content on third-party websites (*Id.* at 171:14–18; 175:20–22); (3) transmit third-party content (*Id.* at 172:5–13); (4) create content on third-party sites (*Id.* at 173:2–5); (5) interact with third-party content providers to assist them in posting content on client websites (*Id.* at 173:19–174:2); (6) modify, screen, or filter content posted on third-party websites (*Id.* at 171:19–172:3); and (7) edit or alter third-party content (*Id.* at 172:14–173:1). Plaintiffs also cite to Jackson's deposition, where he testified that Salesforce does not provide direct services to third parties who post content on Backpage or analyze or review content on Backpage; has no role in transmitting, hosting, editing, or altering content that is posted on Backpage; and has no role in developing or enforcing Backpage's content moderation policies and does not communicate or interact with third-party posters. (Doc. No. 161-1 at 68:18–70:15). Jackson also averred that

11

Salesforce has no control over how Backpage's website appeared to the public, does not block or screen offensive material, does not restrict Backpage or a third-party user from posting on Backpage, and does not offer software to edit materials to protect children from potentially obscene content. (*Id.* at 77:23–78:1; 78:21–79:5; 82:22–83:17).

Moreover, given that neither Salesforce nor its software took any action with respect to content on Backpage or enabled third parties to post content on Backpage, Plaintiffs argue that the facts in this case are distinguishable from the facts in the third-party cases Salesforce cites. (Doc. No. 169 at 18). According to Plaintiffs, the defendants in those cases were software providers that enabled third parties to post content online by providing computer or internet access used to make the posts or by providing web hosting services for the websites on which the content was posted. (*Id.*). In short, Salesforce took no action with regards to Backpage's *externally facing* content like the other defendants. As such, Plaintiffs argue Salesforce cannot be an interactive computer service that is immune under § 230.

After reviewing the relevant briefings, summary judgment evidence, and legal authorities, this Court concludes that Salesforce is an access software provider within the plain language of § 230. The Court cannot adopt Plaintiffs' interpretation for the following reasons.

First, Plaintiffs ask this Court to read an additional requirement into the statutory definition of an interactive computer service provider—that the content be public. In relevant part, § 230(f)(2) defines an "interactive computer service" as:

> Any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

47 U.S.C. § 230(f)(2). The statute further defines an "access software provider" to include:

> A provider of software (including client or server software), or enabling tools that do any one or more of the following: filter, screen, allow, or disallow content; pick, choose, analyze, or digest content; or transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate *content.*

47 U.S.C. § 230(f)(4)(A)-(C) (emphasis added) (cleaned up).

The Supreme Court has held that "the words of a statute must be read in their context" when conducting statutory interpretation. *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). This Court agrees with Plaintiffs, at least in part, that the legislative history of § 230 indicates that the statute was unlikely to have been intended to apply to entities like Salesforce that only manipulate internal data and private communications. Nevertheless, courts "cannot replace the actual text with speculation as to Congress' intent," and this Court declines to do so here. *Magwood v. Patterson*, 561 U.S. 320, 334 (2010). Nothing in the statutory text supports Plaintiffs' proposed interpretation of § 230.

Plaintiffs have not presented any legislative history or case law to support their contention that, contrary to its plain wording, the protections of § 230 are limited to software providers whose products interface with content that is accessible to public internet users. The plain text of the statute only mentions the word "content" in the context of "content providers." The text of access software providers only refers to the ability of the software to manipulate "content." There is no authority that supports Plaintiffs' interpretation that an interactive computer service provider must permit users to interact with a specific type of content. The text only requires that it must simply permit users to interact with content. As read in context with the entirety of the CDA, it is clear Congress chose its wording so the CDA would be interpreted broadly.

As discussed above, § 230(f)(2) defines an interactive computer service as any "information service, system, or access software provider" and § 230(f)(4)(A) through (C) further

defines access software provider as a provider of software or enabling tools that does "*any one or more*" of eighteen defined tasks. 47 U.S.C. § 230(f)(4)(A)-(C) (emphasis added). Salesforce's software clearly falls within § 230's provision because Salesforce has provided uncontested summary judgment evidence that its software can perform seven of the eighteen tasks specified under § 230(f)(4)(A)-(C). Its products can: (1) analyze, (2) transmit, (3) receive, (4) display, (5) cache, (6) search, and (7) organize data.

As to these seven tasks, Plaintiffs appear to dispute only whether Salesforce's software performs tasks pertaining to publicly accessible content, not whether its products can perform these tasks at all. (Doc. No. 169 at 18). Having found that § 230 does not require access software providers to perform these tasks as to publicly accessible content, Plaintiffs' arguments and evidence in this regard do not create an issue of material fact.

Accordingly, this Court finds that Plaintiffs have failed to raise a genuine issue of material fact that counters the evidence that Salesforce's software and tools perform the functions required of an access software provider. Thus, based on the summary judgment evidence and plain language of the statute, Salesforce qualifies as an access software provider and therefore an interactive computer service provider.

### V. Do Plaintiffs' Claims Treat Salesforce as a Publisher?

Having found that Salesforce is an interactive computer service provider, the Court must now address whether Plaintiffs' actual claims against Salesforce seek to treat it as a publisher or speaker of a third party's content. Recall that § 230(c)(1) provides immunity in certain circumstances to interactive computer service providers and states, "[n]o provider or user of an interactive computer service shall be *treated as the publisher or speaker of any information provided by another information content provider*." 47 U.S.C. § 230(c)(1) (emphasis added). Thus,

14

in addition to demonstrating that it is an interactive computer service provider, to obtain immunity Salesforce must show that Plaintiffs' claims seek to treat it as a publisher or speaker of a third party's content to gain the protection of § 230 immunity.

Salesforce argues that Plaintiffs seek to hold it liable for harms they suffered through illegal trafficking advertisements posted by third-party users on Backpage's website, so Plaintiffs' claims "necessarily seek to hold Salesforce 'liable for information originating with a third-party user.'" (Doc. No. 160 at 15) (citing *Diez v. Google, Inc.*, 831 Fed. App'x 723, 724 (5th Cir. 2020)). Further, Salesforce contends that Plaintiffs' claims are predicated on the notion that it should be held responsible for the third-party content through which they were trafficked and their claims, in effect, treat Salesforce as a publisher under § 230. (*Id.*).

Salesforce also contends Plaintiffs attempt to avoid § 230 by "reframing their allegations as challenging Salesforce's alleged conduct—i.e., that Salesforce provided 'tools,' 'services,' and 'support' that Backpage then used to grow its business by soliciting criminals to purchase sex trafficking ads" on Backpage's website. (*Id.* at 16). Salesforce, however, maintains that the actions Backpage took using Salesforce's software are not actions taken by Salesforce itself. Thus, Salesforce concludes that Plaintiffs are attempting to avoid treating Salesforce as a publisher of third-party content, and thus avoid the applicability of § 230, through artful pleading.

In response, Plaintiffs deny that they are suing Salesforce as a speaker or publisher. (Doc. No. 169 at 25). Specifically, Plaintiffs argue that Salesforce "conflates facts concerning Backpage's publication of trafficking advertisements with the allegations that Salesforce facilitated Backpage's trafficking operation." (*Id.*). Plaintiffs also allege that their claims are not "predicated on" holding Salesforce responsible for advertisements posted on Backpage. (*Id.*). Rather, Plaintiffs argue they seek to hold Salesforce liable for knowingly benefitting from assisting

15

Backpage in operating and expanding its sex trafficking operation. (*Id.*). Thus, Plaintiffs argue that § 230 does not apply to Salesforce because they have not alleged in this case that the third-party trafficking advertisements were shared or otherwise conducted via Salesforce technology.

Plaintiffs have also directed this Court to a recent holding in a case, also against Salesforce, with nearly identical facts. *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023) (hereinafter, *G.G. II*). In that case, the district court had granted Salesforce's motion to dismiss, finding that Salesforce was entitled to § 230 immunity because it was both an interactive computer service and the plaintiff's claims treated Salesforce as a publisher of third-party content. *G.G. I*, 603 F.Supp.3d at 633–39. On appeal, the Seventh Circuit, while declining to address whether Salesforce qualified as an interactive computer service, found that Salesforce could not avail itself of § 230 immunity because the plaintiff's claims did not treat it as a publisher of third-party content. The Seventh Circuit stated:

> Section 230 "does not provide a general immunity against all third-party content." Salesforce was simply not involved in any publishing. Salesforce's job was, in part, to help Backpage reach more customers, both in the form of sex traffickers and purchasers of commercial sex. In a sense, Salesforce helped Backpage find more sex-trafficking contractors. Plaintiffs have also not alleged that Salesforce ever "published" any *third-party* content. The only audience for the data Salesforce put online was Backpage itself, and Backpage provided Salesforce with that data.

*G.G. II*, 76 F.4th at 567 (emphasis in original) (internal citations omitted).

In response to Plaintiffs' reliance on this case, Salesforce contends that the law on § 230 immunity in the Fifth Circuit is not the same. Salesforce cites to *Doe v. MySpace, Inc.*, to argue that the Fifth Circuit construes § 230 immunity "broadly in all cases arising from the publication of user generated content." 528 F.3d 413, 418 (5th Cir. 2008); *see also Google, Inc. v. Hood*, 822 F.3d 212, 220–21 (5th Cir. 2016) (holding that § 230 confers immunity on "providers 'for all claims stemming from the[] publication of information created by third parties,' which we and

16

other circuits have consistently given a wide scope."). Defendants argue that, like in *MySpace*, the Plaintiffs here are merely using artful pleading to hide the reality that they are trying to hold Salesforce liable as a publisher for third-party content. After reviewing the parties' arguments and relevant precedent, this Court agrees with the Seventh Circuit's analysis and finds *MySpace* inapplicable.

In *MySpace*, the plaintiffs alleged that the social network was negligent in failing to take sufficient steps to prevent a 13-year-old from lying about her age to create a personal profile, which led to her being contacted by, agreeing to meet, and being sexually assaulted by an alleged predator. *MySpace*, 528 F.3d at 416–17. Importantly, the plaintiffs argued that, under § 230, their claims did not seek to treat MySpace as a publisher, since the claims were "predicated solely on MySpace's failure to implement basic safety measures to protect minors." *Id.* at 419. The Fifth Circuit rejected this argument, finding the plaintiffs' "artful pleading disingenuous." *Id.* at 420. It found that "no matter how artfully Plaintiffs [sought] to plead their claims," the underlying basis of those claims sought to hold MySpace liable in its "publishing, editorial, and/or screening capacities." *Id.*

In *MySpace*, both the district court and the Fifth Circuit reasoned that if the heart of a plaintiff's complaint is the act of publication, the plaintiff cannot dance around that fact by artful pleading. *Id.* at 419–20. "What matters is the crux or in legal-speak, the gravamen of plaintiff's complaint, setting aside any attempts at artful pleading." *T.B. v. Nw. Indep. Sch. Dist.*, 980 F.3d 1047, 1052 (5th Cir. 2020); *see also Diez v. Google, Inc.*, 831 Fed. App'x 723 (5th Cir. 2020) (despite the fact that plaintiff's claims were for violations of the Texas Business and Commerce Code and federal child pornography statute, it was evident that Google was being sued as a publisher of material posted by a third party).

17

Salesforce's interpretation of Fifth Circuit precedent is too broad. First, in all three cases cited, the Fifth Circuit was actually dealing with platforms—not equipment or service providers. *See also, Doe Through Roe v. Snap, Inc.*, 2023 WL 4174061 (5th Cir. June 26, 2023); *Google v. Hood*, 822 F.3d 2121 (5th Cir. 2016). Second, the Fifth Circuit recently made clear that § 230's emphasis was on **published content**. Section 230 provides that the platform "shall [not] be treated as the publisher or speaker of content developed by other users." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 465 (5th Cir. 2022). The Fifth Circuit further explained that the goal of § 230 immunity is to protect platforms, who do not exercise meaningful editorial control, from liability arising out of users' posted content and speech. Section 230, then, "reflects Congress's factual determination that the Platforms are not 'publishers'" of that speech. *Id.* at 467. Thus, the Fifth Circuit's analysis has been focused on platforms that would otherwise be considered speakers or publishers and consequently be subject to lawsuits as such.

Salesforce's interpretation not only misunderstands Fifth Circuit precedent, but also essentially eliminates the second half of the § 230 analysis. The second prong requires that, to be entitled to immunity, the interactive computer service provider must be sued as a publisher of third-party content. If immunity were to cover *all* interactive computer service providers every time and under every circumstance, then every entity, regardless of circumstance, would be immune in all circumstances. That is not what the CDA states. It states that immunity only arises where the claim seeks to treat an interactive computer service provider as a publisher or speaker. If immunity automatically attached as to all actors regardless of the circumstances, then the restriction to being treated like a "publisher or speaker" would be meaningless.

This Court finds that this case is not an example of one artfully pled around an obvious publisher claim. The claim here is a third-party beneficiary claim specifically provided for by

federal law. Plaintiffs seek to hold Salesforce responsible for profiting off Backpage's direct actions (allegedly concealing and promoting sex trafficking), not content published by Backpage's users (who are the actual content providers). As such, the Fifth Circuit authority cited by Salesforce is not persuasive.

The gravamen of Plaintiff's current complaint is that Salesforce knowingly benefitted from its participation in Backpage's hosting of a human trafficking scheme. This is not a claim for publisher or speaker liability. Plaintiffs allege that "Salesforce benefitted from the products and assistance it provided to Backpage, which Salesforce knew or should have known was facilitating sex trafficking." (Doc. No. 96 at 13). The Plaintiffs specify that, "Salesforce knowingly assisted, supported and facilitated sex trafficking" by enabling Backpage to do a variety of tasks, including gathering, collecting, and analyzing traffickers' data; utilizing cloud storage to securely store information; implementing payment processing; and improving sales opportunities for traffickers. (*Id.* at 13–14). In essence, they allege that Salesforce provided ongoing and highly customized support to Backpage, which Salesforce knew or should have known Backpage was using to facilitate sex trafficking.

Given the substance of these pleadings, the Seventh Circuit's holding in *G.G. II* is more akin to the case at hand. There, the panel found that the plaintiff in that case did not seek to treat Salesforce as a publisher because:

> Salesforce was simply not involved in any publishing. Salesforce's job was, in part, to help Backpage reach more customers, both in the form of sex traffickers and purchasers of commercial sex. In a sense, Salesforce helped Backpage find more sex-trafficking contractors.

*G.G. II*, 76 F.4th at 567.

The Court reaches the same conclusion here. Plaintiffs' pleadings demonstrate that they are not artfully pleading around an obvious publisher claim. *See* (Doc. No. 96). Instead, their

pleadings focus on holding Salesforce liable for its own individual actions with respect to allegedly benefitting, facilitating, and furthering Backpage's sex trafficking venture. Plaintiffs' claims center around Salesforce's knowing back-office support of Backpage's alleged trafficking rather than Salesforce's role as a publisher of third-party content.

In conclusion, having found that Salesforce is an interactive computer service provider, but that Plaintiffs' claims do not treat or attempt to treat Salesforce as a publisher or speaker of third-party content, the Court finds that Salesforce is not entitled to § 230 immunity.

## VI. Conclusion

The Court hereby finds as a matter of law that Salesforce is an access software provider and therefore a computer science provider. As such, Salesforce may qualify for immunity under § 230 in the appropriate case. That being said, the Court finds that Salesforce has not been sued as a publisher or speaker and, consequently, is not entitled to immunity under § 230. Therefore, the Court **DENIES** Salesforce's Motion for Summary Judgment (Doc. No. 160). Having denied Salesforce's motion for summary judgment, Plaintiffs' Motion to Reopen Discovery and Leave to Amend their Summary Judgment Response (Doc. No. 187) is hereby denied as moot. Within thirty days, the parties are to meet and confer and propose a schedule to the Court (including discovery on the merits) that will take this case through conclusion.

Signed this 20th day of November 2023.

Andrew S. Hanen
United States District Judge